```
`
```

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO MONTES LINARES,<br><br>    Petitioner,<br><br>    v.<br><br>W. J. SULLIVAN,<br><br>    Respondent. | No. 2:17-cv-427 TLN AC P<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2012 conviction for first-degree murder and sentence of 50 years to life imprisonment. ECF No. 1. Respondent has filed an answer and provided the state court record. ECF Nos. 15 & 16.

BACKGROUND

I.    Proceedings In the Trial Court

    A.  Preliminary Proceedings

An information charged petitioner Antonio Montes Linares with the murder of Jose Sanchez and alleged that he personally discharged a firearm. Lodged Doc. 1 at 15 -16.

////

////

1

B. <u>The Evidence Presented at Trial</u>[1]

The jury heard evidence of the following facts. Nine-year-old Alexandria H. was playing outside, by the front window of her home, when she heard a boom. Her older brother Timothy Nunez and his friends Jose Sanchez and petitioner had been hanging out inside the house. When Alexandria looked through the front window, she saw petitioner shoot Sanchez with a black gun. Alexandria saw Sanchez's ear bleeding and heard him say "ow" and "stop." She also heard Nunez say "stop." Alexandria saw petitioner continue to shoot Sanchez.

Hector Silva, petitioner's stepbrother, was getting ready for work when he received a call from Nunez. Nunez sounded panicked and asked Silva to immediately go to Nunez's house. When Silva arrived at Nunez's house, petitioner entered his car. Silva smelled the odor of bleach. Petitioner told Silva, "Someone's dead; it's Pepe [Sanchez's nickname]; I can't talk about it now; I'll tell you later."

When Nunez's mother Brandy Ann Ramsey arrived home in the evening, she saw a blue pickup truck backed up to the front door of her house. Petitioner got in the pickup truck and left. Ramsey smelled the odor of bleach and a lavender scented cleaning solution in her home. She saw a stain that looked like blood on the carpet, by her front door. She noticed two shower curtains from her home were missing.

Petitioner returned to Nunez's house about an hour and a half after he had left. He took a shower in the downstairs bathroom. Then petitioner and Nunez left the house.

Later that night, petitioner asked Silva to drive him to a bridge. Petitioner told Silva he placed Sanchez's body under the bridge. Petitioner had burned the body. Petitioner went to look at the body, and he reported the body had not completely burned. Silva and petitioner returned the next morning, and petitioner attempted to burn Sanchez's body one more time.

Silva subsequently saw petitioner and Nunez burning clothes near a bike path by petitioner's apartment. Petitioner and Nunez told Silva what happened to Sanchez. Petitioner

---

[1] This summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 16. The undersigned has independently reviewed the trial transcript and finds the appellate court's recitation of the facts to be accurate.

2

and Nunez said petitioner pointed a gun at Sanchez and the gun fired. Petitioner shot Sanchez. Sanchez tried to hide behind Nunez. Petitioner tried to shoot Sanchez again and missed. But petitioner "emptied the clip" when Sanchez sat down on a chair.

Two days after the shooting, police received a tip that petitioner accidentally shot Sanchez in Nunez's home with a .22 caliber gun which belonged to Nunez. Acting on the information they received, police searched Nunez's house. Police found blood at three locations in the house: on the bottom of a couch located in the living room, on a polo shirt in the downstairs bedroom, and on the door jamb of the front entry door. Police found an empty box of .22 caliber ammunition, partially burned pieces of wood and drywall, what appeared to be tattoo needles, and a partially burned sponge in the fireplace.

During a subsequent search of the house, police found diluted blood stains on one of the kitchen chairs. There was a probable bullet strike on the kitchen floor, and a .22 caliber bullet embedded in the kitchen wall, next to the dining room table. Bloodstains were also located on the carpet in the entryway, near the front door. DNA testing provided strong evidence that Sanchez was the source of the blood stains found on the couch, kitchen chair, and carpet, and that Sanchez was the primary source of the blood found on the polo shirt recovered from Nunez's house.

Detective Scott Harris questioned Ramsey before police searched her home. Ramsey denied any knowledge of a shooting. But she said petitioner left as she arrived home, and she smelled the odor of a cleaning solution in her home. During a second conversation with Detective Harris, Ramsey disclosed her daughter said she heard a gunshot when she was playing outside. At trial Ramsey admitted she was not honest and did not disclose everything she knew when she spoke with Detective Harris. Ramsey said she was concerned Nunez was involved, so she wanted to speak with Nunez and find out what happened before speaking with the authorities.

Police recovered three expended .22 caliber shell casings by a bike path near petitioner's apartment. A criminalist later determined the shell casings were fired from the same semiautomatic firearm, but the specific type of semiautomatic firearm that was used could not be ascertained. Also, by the bike path, police saw an ash pile from which they recovered a burnt zipper pull and metal eyelets, possibly from a shoe. In a nearby creek, police found a set of keys

which included a key to Sanchez's home.

Silva cooperated with the police. He gave police the following account: Petitioner told Silva that Sanchez was being "antagonistic" when Nunez, petitioner, and Sanchez were hanging out at Nunez's house. Petitioner pointed a gun at Sanchez and the gun discharged. Sanchez put his hand up to his head and said, "Holy shit, you shot me in the head." Petitioner freaked out. Sanchez tried to hide behind Nunez. Petitioner "emptied the clip" into Sanchez. Petitioner and Nunez wrapped Sanchez's body in a shower curtain. Petitioner placed the body under a bridge and burned the body.

Sanchez's body was discovered under a bridge. The body was wrapped in a plastic material that appeared to be a tarp or a shower curtain. It appeared the body had been burned under the bridge. Most of the body was charred.

Petitioner and Nunez left town after police searched Nunez's house. Police arrested petitioner and Nunez in Gilroy. Nunez acknowledged there was a shooting, and that Sanchez, Nunez, and petitioner were present at the shooting.

The People's expert on cause of death, Dr. Thomas Resk, opined that Sanchez died as a result of multiple gunshot wounds to the head and torso. Death occurred over a period of minutes. Dr. Resk determined Sanchez's body was burned after Sanchez died. Dr. Resk identified six gunshot wounds. Sanchez was shot in his right upper arm; the left side of his head, above his ear; the back of his head; the right side of his chest; the left side of his back; and his left hand. The bullet which entered the right side of Sanchez's chest perforated his right lung and lodged in his pericardial sac.

Dr. Resk opined that Sanchez was alive when he received that gunshot wound and the wound to his left hand. Dr. Resk did not note any defensive wounds on Sanchez's left hand or any indication that Sanchez had been in a fight. There was nothing to indicate that Sanchez had been stabbed or cut in any significant way.

The projectiles recovered from Sanchez's body were consistent with .22 caliber bullets. It could not be determined whether the bullets were fired from the same weapon. There were over 200 models of firearms that could have fired those bullets. It also could not be determined

whether the bullet found in Nunez's kitchen wall was fired from the same weapon that fired the bullets recovered from Sanchez's body. No gun was recovered in connection with this case.

Detective Ratto testified as a gang expert. His testimony explained why petitioner might have killed Sanchez if petitioner initially shot Sanchez by accident. Detective Ratto opined that Nunez, Sanchez, and petitioner were members of the Norteño criminal street gang. According to the detective, a Norteño gang member can be targeted for assault, killed, or expelled from the gang if he shot another Norteño gang member without a "green light," even if the shooting was accidental. Detective Ratto was not aware of any "green light" on Sanchez.

### C. Outcome

The jury convicted petitioner of first-degree murder. It found that petitioner personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Sanchez. It also found that petitioner personally used a deadly and dangerous weapon within the meaning of California Penal Code section 12022.5, subdivision (a). The trial court sentenced petitioner to 25 years to life, plus a consecutive term of 25 years to life pursuant to section 12022.53, subdivision (d). The trial court imposed but stayed an additional consecutive 10-year term for the section 12022.5, subdivision (a) enhancement. Petitioner's aggregate sentence was 50 years to life in prison.

### II.     State Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction, and petitioner's sentence, on May 20, 2016. Lodged Doc. 16.[2] The California Supreme Court denied review on August 31, 2016. Lodged Doc. 18. Petitioner filed no applications for state habeas relief.

////

////

---

[2] Justice Duarte filed a concurring opinion, disagreeing with the majority's finding that petitioner failed to preserve his objection to the prosecution's introduction of a witness's prior recorded statement. She noted that although she would conclude the objection preserved, she found the trial court did not abuse its discretion in allowing the evidence. Lodged Doc. 16. Admission of the prior recorded statement is not presented as a basis for federal habeas relief. See ECF No. 1 at 2, 4-5 (identifying this claim as one presented on appeal); id. at 7, 13 (grounds for federal relief).

III.     Proceedings in this Court

The instant federal petition, ECF No. 1, presents two claims for relief: (1) that petitioner's trial counsel had a conflict of interest in continuing to represent him on his new trial motion; and (2) that petitioner's sentence violates the principles articulated in Miller v. Alabama, 567 U.S. 460 (2012). Id. at 7, 13. Respondent answered. ECF No. 15. Petitioner did not file a traverse.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

6

issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 563 U.S. at 102.

## DISCUSSION

I. Claim One: Defense Counsel's Conflict of Interest in Representing Petitioner on His New Trial Motion

A. Petitioner's Allegations and Pertinent State Court Record

The petition alleges that Attorney Vandervoort, who was second chair to Attorney Dulebohn at trial, had a conflict of interest that rendered his representation of petitioner on the new trial motion constitutionally defective. ECF No. 1 at 7-11. After the verdict, both defense lawyers moved to be relieved as counsel; shortly thereafter, Vandervoort filed a "notice of

7

representation" seeking to withdraw his request to be relieved. It stated that Vandervoort had filed his motion "to be safe as second chair," but after consultation with "numerous lawyers, organizations, and my own personal lawyer" had concluded that he was "shielded" from any conflict that Dulebohn might have. Dulebohn filed a motion for a new trial before being relieved, and his declaration in support of the motion stated that he had belatedly recognized inconsistencies in the evidence that should have been explored prior to trial and might have led to a different defense theory and exculpated petitioner. Both the status of counsel and the new trial motion were addressed at the judgment and sentencing hearing. The court relieved Dulebohn, permitted to Vandervoort to represent petitioner, denied the new trial motion, and proceeded to sentencing. Petitioner alleges that the trial court violated his due process rights by failing to inquire further into Vandervoort's conflict of interest. Id.

The state court record confirms petitioner's account and provides the following additional details. The motions of attorneys Dulebohn and Vandervoort to be relieved as counsel, CT 461-67 (Lodged Doc. 2),[3] each represented "that the attorney/client privilege [sic] has broken down and that there is now a legal and factual conflict of interest between the attorney and defendant." Id. No details were provided. Vandervoort's subsequent request to withdraw his motion stated that he had "discuss[ed] the situation with numerous lawyers, organizations, and my own personal lawyer" and that he felt he was "shielded and screened for any possible conflict for which Mr. Dulebohn withdr[ew]." Id. at 503.

At the outset of the sentencing hearing on May 18, 2021, the court addressed the status of counsel. Mr. Dulebohn confirmed his desire to be relieved, and Mr. Vandervoort confirmed his intention to continue representing petitioner for purposes of the new trial motion and sentencing. RT 1471-74 (Lodged Doc. 8).[4] Vandervoort specified that he would be representing petitioner on the motion for new trial "in the sense that I will be submitting on the documents that have previously been filed." Id. at 1473. The following colloquy ensued:

////

---

[3] "CT" refers to the Clerk's Transcript on Appeal, which is found at Lodged Docs. 1 & 2.
[4] "RT" refers to the Reporter's Transcript on Appeal, which is found at Lodged Docs. 4-8.

8

| | |
|---|---|
| 1 | THE COURT: Okay. Mr. Linhares, good afternoon, sir. |
| 2 | DEFENDANT ANTONIO MONTES LINARES: Good afternoon. |
| 3 | THE COURT: I want to make sure you understand what's going on. |
| 4 | Mr. Dulebohn's requesting to be relieved. And Mr. VanDervoot is indicating he's going to represent you for today's proceedings. Is |
| 5 | that acceptable to you, sir? |
| 6 | DEFENDANT ANTONIO MONTES LINARES: Yes, Your Honor. |

Id.

Without further inquiry, the court granted Dulebohn's motion to be relieved, granted Vandervoort's request that his own motion be stricken, and indicated that Vandervoort would represent petitioner for purposes of that day's proceedings. Id. at 1471, 1474. When the court turned to the motion for a new trial, Vandervoort submitted the matter on the basis of the written motion and exhibits, without further argument. Id. at 1475. The court denied the motion for a new trial and proceeded to sentencing. Id. at 1476.

B. The Clearly Established Federal Law

The Sixth Amendment right to the effective assistance of counsel carries with it "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981) (citations omitted). A conflict of interest exists where counsel's loyalties are prejudicially divided, for example between the client represented and the person paying for the representation. See id. at 272 (noting possible conflict where counsel was retained by defendants' employer, whose interests in relevant proceedings may have diverged from those of defendants). Where the possibility of a conflict is apparent, the court must inquire and determine whether counsel is actually conflict-free in order to assure the defendant's right to effective counsel. Id.

C. The State Court's Ruling

Petitioner raised this claim on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal for the Third Appellate District constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034

9

(9th Cir. 2012).

The California Court of Appeal ruled as follows:

> Defendant […] claims the trial court failed to inquire whether his trial counsel had a conflict of interest in continuing to represent him on his new trial motion.
>
> The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee a defendant the right to effective assistance of counsel. People v. Bonin, 47 Cal.3d 808, 833 (1989). The purpose of that right is to ensure that the defendant receives a fair trial. Id. at 834. Included in the right to the effective assistance of counsel is the right to representation free from conflicts of interest. Id. at p. 833-34.
>
> The trial court must make an inquiry into the matter when it knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel. Wood v. Georgia, 450 U.S. 261, 272 (1980); Bonin, 47 Cal.3d at p. 836. We examine the facts before the trial court to determine whether a duty of inquiry existed. Wood, 450 U.S. at p. 272-74.
>
> Defendant says the trial court had reason to suspect that his trial counsel, Joe Vandervoort, had a conflict of interest because he and codefense counsel Geoff Dulebohn filed motions to be relieved as counsel, indicating there was a conflict of interest, and the trial court permitted Dulebohn to withdraw as defendant's counsel. Defendant claims the trial court could not determine whether Dulebohn's conflict of interest also extended to Vandervoort without inquiry.
>
> Dulebohn filed a motion to be relieved as counsel after the jury returned its verdict but before the trial court sentenced defendant. Dulebohn sought to withdraw as defendant's counsel because "the attorney/client privilege [had] broken down" and there was "a legal and factual conflict of interest between the attorney and defendant." Vandervoort filed a nearly identical motion.
>
> It appears Vandervoort and Dulebohn's motions to withdraw are based on Dulebohn's late reexamination of a photograph he claimed supported a different theory of how Sanchez was killed. Dulebohn said that during the trial, he began to formulate a theory that Sanchez was tortured and killed in the downstairs bathroom of Nunez's home. Dulebohn believed the wound to Sanchez's left hand was not a bullet wound, but rather the wound indicated Sanchez's left hand was staked to the bathroom floor by a V-shaped metal object. Dulebohn said that upon reexamining the evidence with greater scrutiny during the trial, he came to believe the living room and kitchen were "dressed up" as "a decoy crime scene." According to Dulebohn, he could not prove his theory without additional investigation, and he thought "it was too late at that point." Dulebohn said that after the verdict, he used photo editing to enhance a photograph of the floor of Nunez's downstairs bathroom, and the enhanced photograph showed a V shape in the bathroom floor. Dulebohn argued the enhanced photograph, along with other evidence presented at the trial

10

(such as a V-shaped flap on Sanchez's left hand), supported his new theory.

The motions to be relieved as counsel, and defendant's motion for a new trial, do not indicate Vandervoort was responsible for the late discovery of the asserted new evidence. Dulebohn said he did not reexamine a particular photograph of the bathroom floor until after the verdict. Dulebohn did not attribute the belated scrutiny of the photograph to Vandervoort. Dulebohn said he would have sought to have a medical expert analyze the evidence had he realized the photograph of the bathroom floor supported his theory that Sanchez was tortured in the bathroom. Dulebohn did not say Vandervoort was responsible for any omission with regard to a medical expert.

Moreover, Vandervoort told the trial court he had no possible conflict of interest. Vandervoort said he filed a motion to be relieved as counsel because Dulebohn filed one, and Vandervoort believed he should withdraw as defense counsel "to be safe." Vandervoort said he changed his opinion "after discussing the situation with numerous lawyers, organizations, and [his] own personal lawyer that [he] was shielded and screened for any possible conflict for which Mr. Dulebohn withdraws." The trial court may rely on Vandervoort's representations that no possible conflict existed. People v. Lawley, 27 Cal.4th 102, 146 (2002). Under the circumstances, the trial court had no duty to inquire because it had no reason to know or suspect Vandervoort had any conflict of interest.

The Attorney General points out that defendant agreed to Vandervoort's continued representation after the verdict. To the extent the Attorney General claims defendant waived his right to unconflicted representation, the record does not show defendant knowingly waived that right. "'[W]aivers of constitutional rights must . . . be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences[,]" . . . [and] must be unambiguous and "without strings."' [Citations.] [¶] Before it accepts a waiver offered by a defendant, the trial court need not undertake any 'particular form of inquiry . . . , but, at a minimum, . . . must assure itself that (1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right.'" Bonin, 47 Cal.3d at p. 837. The record does not show defendant was made aware of his right to conflict-free representation, of the possible consequences of potentially conflicted representation, and that he had discussed the potential drawbacks of such representation with counsel.

Defendant further argues that Vandervoort's less than zealous advocacy on the new trial motion indicated an undisclosed conflict. The trial court announced it had read defendant's new trial motion. The motion contained a lengthy declaration by Dulebohn. Vandervoort told the trial court the new trial motion was "well taken" and should be granted, but he would not "argue any facts."

11

> We are not convinced Vandervoort was a less than zealous advocate in representing defendant on the new trial motion or that Vandervoort had an undisclosed conflict. Based on our review of the record, it appears Vandervoort believed the written motion and the lengthy declaration by Dulebohn adequately set forth the grounds for granting a new trial, and he elected not to restate the arguments and factual assertions contained in the written motion. Vandervoort's election to submit the matter on the papers does not demonstrate he had a possible conflict of interest and did not trigger a duty to inquire on the part of the trial court.
>
> In addition, defendant claims the trial court should have inquired whether Vandervoort had a conflict of interest which prevented him from seeking a new trial based on ineffective assistance of counsel. A motion for new trial may be based on ineffective assistance of counsel. People v. Fosselman, 33 Cal.3d 572, 582 (1983). Defendant asserts he received ineffective assistance of counsel because Dulebohn and possibly Vandervoort overlooked a defense theory that Sanchez was tortured and then killed in the bathroom, and counsel failed to request a continuance of the trial to retain a medical expert to explore that theory.
>
> To establish ineffective assistance of trial counsel, defendant must prove (1) that trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) that the deficiency resulted in prejudice to the defendant. People v. Maury, 30 Cal.4th 342, 389 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984).
>
> As we have explained, nothing before the trial court indicated Vandervoort was responsible for the belated discovery of the enhanced photograph or the failure to retain a medical expert. Because defendant fails to prove inadequate representation by Vandervoort in this regard, defendant also fails to establish the trial court breached a duty to inquire based on Vandervoort's omissions. People v. Mai, 57 Cal.4th 986, 1033-35 (2013) (rejecting claim that conflict of interest prevented defense counsel from asserting that the defendant was incompetent to stand trial where there was no substantial evidence of the defendant's incompetence).
>
> We also conclude defendant fails to establish his claim based on alleged inadequate representation by Dulebohn. Nothing in the record shows Vandervoort's relationship with Dulebohn prevented Vandervoort from arguing that Dulebohn's representation was deficient. Vandervoort could have reasonably concluded that an ineffective assistance of counsel claim lacked merit because Dulebohn presented his torture theory to the jury. Dulebohn asked the jury to find that Sanchez was killed in the bathroom, and that defendant did not kill Sanchez. We reject defendant's claim of ineffective assistance by Vandervoort because there is a rational explanation for Vandervoort's omission. Mai, 57 Cal.4th at p. 1009.
>
> Unconflicted counsel could also have reasonably concluded an ineffective assistance of counsel claim against Dulebohn was unmeritorious because a different verdict was not reasonably

> probable. There is no evidence Sanchez was shot in the bathroom. There is no evidence of bloodstains found in the bathroom. Dulebohn argued to the jury that defendant did not kill Sanchez, and that Sanchez was killed in the bathroom. But the jury found defendant committed murder. Defendant does not show that he could not have shot Sanchez in the kitchen area, as Alexandria testified she saw, if Sanchez had been tortured in the bathroom.
>
> In sum, we cannot conclude the trial court knew or reasonably should have known of the possibility of a conflict of interest on the part of defense counsel Vandervoort. Accordingly, we reject defendant's claim that under the circumstances before it, the trial court had a duty to inquire further concerning a possible conflict of interest.

Lodged Doc. 16 at 9-14.

### D. Objective Reasonableness Under § 2254(d)

Petitioner has identified no unreasonable application of U.S. Supreme Court precedent by the California Court of Appeal, and none is apparent. The state court accurately stated and reasonably applied the constitutional principles set forth in Wood v. Georgia and Strickland v. Washington. Its finding that the trial court was not constitutionally compelled to inquire further into the possibility of an actual conflict is consistent with Wood, because no possibility of an actual conflict was apparent.

No unreasonable factual conclusions underly the state court's application of Wood. Its discussion of the superior court record is accurate: there was no evidence that Vandervoot was responsible in any way for the belated discovery of evidence or the failure to retain an expert, or that he was otherwise ineffective or acting in the interests of anyone other than petitioner. No facts or circumstances indicated that Vandervot's failure to launch an ineffective assistance attack on Dulebohn was anything but a legitimate exercise of professional judgment. Mere speculation about these matters does not support relief, and it was not objectively unreasonable for the state court to reject speculative theories. Absent facts that make it apparent an actual conflict of interest may exist, there is no constitutional duty of further inquiry. See Wood, 450 U.S at 272.

Moreover, Vandervoort affirmatively represented in the trial court that he did not have a conflict of interest. CT 503 (Lodged Doc. 2). The judge was permitted to rely on this representation. See United States v. Crespo de Llano, 838 F.2d 1006, 1012 (9th Cir. 1987) ("In

ascertaining whether the risk of conflict warrants appointment of separate counsel, the court is entitled to rely on the 'good faith and good judgment of defense counsel' who represents to the court that no conflict exists."); United States v. Bradshaw, 719 F.2d 907, 915 n.3 (7th Cir. 1983) ("Generally, the [trial[]] court is entitled to rely on the assertions of counsel" that no conflict exists). This federal authority is consistent with the California authority cited by the court of appeal. See Lodged Doc. 16 at 11-12 (citing People v. Lawley, 27 Cal.4th 102, 146 (2002)).

No U.S. Supreme Court precedent holds that a full hearing into a theoretically possible conflict is required under circumstances analogous to those presented here. This is not a case like Wood in which counsel was paid for by a party with its own distinct interests in the case,[5] and it does not involve joint representation of codefendants like Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) and Mickens v. Taylor, 535 U.S. 162, 172-73 (2002).[6] Because there is no "clearly established federal law" directly supporting petitioner's conflict theory,[7] relief is unavailable under the AEDPA. See Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam) (if no

---

[5] In Wood, the criminal defendants were employees of an "adult" business charged under an obscenity statute, and they were represented by the business's lawyer. While the interests of the business and its employees may have been aligned as to the constitutionality of the obscenity statute, they were not aligned as to the payment of fines imposed on the employees upon their conviction, which was at issue on appeal.

[6] In the joint representation context, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). If this showing is made, prejudice is presumed. Id. at 349-50; Mickens v. Taylor, 535 U.S. 162, 172-73 (2002). "However, in Mickens, the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest (also known as the 'Sullivan exception') to cases involving 'concurrent representation.'" Rowland v. Chappell, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing Mickens, 535 U.S. at 175); see also Earp v. Ornoski, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The Mickens Court specifically and explicitly concluded that Sullivan was limited to joint representation[.]").

[7] On appeal, petitioner argued that the possibility of an actual conflict was apparent because (1) Vandervoort had initially identified a conflict, as indicated by his motion to be relieved, (2) Vandervoort's reported consultation with other lawyers and legal organizations about the possibility of a conflict showed he considered the possibility to be serious, (3) Vandervoort's submission of the new trial motion on the papers reflected "reluctant rather than zealous advocacy," and (4) the content of the new trial motion demonstrated a need to inquire whether Vandervoort had, like Duleboh, possibly provided ineffective assistance of counsel by overlooking an available defense theory. Lodged Doc. 10 (Appellant's Opening Brief) at 38-40. Although the new trial motion was not based on ineffective assistance, petitioner implied that Vandervoort's failure to allege Duleboh's ineffective assistance demonstrated his own conflict. Id. at 40-43.

1  Supreme Court precedent controls a legal issue raised by a habeas petitioner in state court, the
2  state court's decision cannot be contrary to, or an unreasonable application of, clearly established
3  federal law).

4  Even under pre-AEDPA standards, petitioner could not prevail on this claim. The petition
5  is devoid of facts that would demonstrate prejudice from Vandervoort's performance on the new
6  trial motion or at sentencing, as required for post-conviction relief under Strickland v.
7  Washington, 466 U.S. 668, 693-94 (1984) (petitioner must demonstrate a reasonable probability
8  that, but for counsel's errors, the result of the proceeding would have been different), and/or
9  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (habeas relief available only where error had a
10 substantial and injurious effect on the outcome).

11  II.   Claim Two: Petitioner's Sentence Violates the Eighth Amendment Prohibition
12        Against Cruel and Unusual Punishment
13        A.   Petitioner's Allegations

14  Petitioner alleges that his sentence of 50 years to life imprisonment violates the Eighth
15 Amendment prohibition of cruel and unusual punishment. ECF No. 1 at 13-14. Petitioner was 19
16 years, 2 months, and 23 days old on the date of the crimes, and studies show that brain
17 development continues until around age 25. Petitioner's sentence is the functional equivalent of a
18 mandatory life without parole sentence, given plaintiff's age, the life expectancy for Hispanic
19 males in the United States, and data showing that incarceration significantly reduces life
20 expectancy. Id.

21        B.   The Clearly Established Federal Law

22  The Eighth Amendment forbids mandatory sentences of life imprisonment without the
23 possibility of parole for juvenile offenders. Miller v. Sanchez, 567 U.S. 460 (2012).[8] In the non-
24 capital sentencing context generally, the Eighth Amendment does not require strict
25 proportionality between crime and sentence but forbids extreme sentences that are grossly

---

[8] The Eighth Amendment also forbids capital punishment for juvenile offenders, Roper v. Simmons, 543 U.S. 551 (2005), and life sentences without the possibility of parole for juvenile offenders convicted of non-homicide crimes, Graham v. Florida, 560 U.S. 48 (2010).

disproportionate to the crime. Graham v. Florida, 560 U.S. 48, 59-60 (2010); see also Lockyer v. Andrade, 538 U.S. 63, 72 (2003).

### C. The State Court's Ruling

The California Court of Appeal ruled as follows:

> Defendant also contends his sentence violates the principles articulated in Miller v. Sanchez, 567 U.S. 460 (2012), even though he was over the age of 18 when he murdered Sanchez.
>
> The Attorney General counters that defendant did not preserve his Eighth Amendment claim for appellate review. We disagree. The People asked the trial court to sentence defendant to 50 years to life in prison. Defense counsel asked the trial court for leniency, and referenced the constitutional prohibition against cruel or unusual punishment.
>
> Although defendant did not forfeit his Eighth Amendment claim, the claim fails on the merits. Defendant's Eighth Amendment claim is based on Miller, 567 U.S. 460, Graham v. Florida, 560 U.S. 48 (2010), Roper v. Simmons, 543 U.S. 551 (2005), People v. Gutierrez, 58 Cal.4th 1354 (2014), and People v. Caballero, 55 Cal.4th 262 (2012). But, unlike defendant, the defendants in those cases were under the age of 18 at the time of their crimes. Miller, 567 U.S. at p. __ [183 L.Ed.2d at pp. 415-416]; Graham, 560 U.S. at p. 53-55, 74; Roper, 543 U.S. at p. 578; People v. Gutierrez, 58 Cal.4th at p. 1360; People v. Caballero, 55 Cal.4th at p. 265.
>
> Miller, 567 U.S. __ [183 L.Ed.2d 407] and the other cases cited by defendant do not require us to remand this matter. People v. Argeta, (2012) 210 Cal.App.4th 1478, 1482 (2012) (the rationale applicable to the sentencing of juveniles in Miller, supra, 567 U.S. __ [183 L.Ed.2d 407]), Graham, 560 U.S. 48 and People v. Caballero, 55 Cal.4th 262 (does not apply to a defendant who was over 18 years old at the time of the crime); People v. Abundio, (2013) 221 Cal.App.4th 1211, 1220-21 (follows Argeta, 210 Cal.App.4th 1478).
>
> The United States Supreme Court recognized an argument can be made that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Roper, 543 U.S. at p. 574. Defendant makes a similar argument here. Nonetheless, the Supreme Court drew the line for Eighth Amendment purposes at age 18. Graham, 560 U.S. at p. 74-75 ("[b]ecause '[t]he age of 18 is the point where society 16 draws the line for many purposes between childhood and adulthood,' those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime."); Roper, 543 U.S. at p. 574; Gutierrez, 58 Cal.4th at p. 1380. We are bound to follow the clear line the United States Supreme Court has drawn. People v. Fletcher, 13 Cal.4th 451, 469, fn. 6 (1996) (the decisions of the United States Supreme Court on questions of federal constitutional law are binding on all state courts).

Lodged Doc. 16 at 14-16.

### D. Objective Unreasonableness Under § 2254(d)

It was not objectively unreasonable of the California Court of Appeal to reject petitioner's reliance on Miller. The U.S. Supreme Court held in Miller that the Eighth Amendment forbids the mandatory imposition of life without parole sentences on juvenile offenders. Petitioner was not sentenced to life without parole at all, let alone under a statute making that sentence mandatory for his offense, and he was not a juvenile when he committed the crime. Accordingly, Miller by its plain terms does not apply to his case.

The undersigned understands and appreciates petitioner's argument that his relative youth should mitigate his culpability, and that a 50-to-life sentence is in practical effect tantamount to an LWOP sentence. However, federal habeas relief is available only where the state court's previous rejection of a claim was objectively unreasonable in light of existing U.S. Supreme Court precedent. 28 U.S.C. § 2254(d). Where no Supreme Court precedent "squarely addresses" an issue or establishes a principle that "clearly extend[s] to a new context," there is no clearly established federal law within the meaning of AEDPA and thus there can be no federal habeas relief. Wright, 552 U.S. at 125. Federal habeas is simply not a vehicle for expanding substantive constitutional protections to novel contexts. Id.

The denial of petitioner's Miller claim cannot be considered objectively unreasonable when the Ninth Circuit has rejected a Miller-based claim under circumstances involving a life without parole sentence imposed on a juvenile offender. See Bell v. Uribe, 748 F.3d 857, 869-870 (9th Cir. 2014) (Miller does not prohibit sentence of life without parole for juvenile convicted of murder and provided an individualized sentencing determination). Miller has even less applicability here, where petitioner was both above the age of majority and sentenced to a term of imprisonment that provides for the possibility of parole. The Supreme Court itself established a bright-line Eighth Amendment distinction between offenders above and below the age of 18. Graham v. Florida, 560 U.S. 48, 75-75 (2010). The California Court of Appeals followed the law as articulated by the Supreme Court, and its judgment therefore may not be disturbed in federal habeas.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 14, 2022

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE